# PAHOKEE FARMS, INC. v BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT TRUST FUND and DEPARTMENT OF NATURAL RESOURCES

## Case No. 85-0799R

State of Florida, Division of Administrative Hearings

August 9, 1985

### APPEARANCES OF COUNSEL

**F. Perry Odom, Dean Bunch,** and **Robert G. Gough, Ervin, Varn, Jacobs, Odom & Kitchen,** for petitioner.

**Spiro T. Kypreos,** Assistant General Counsel, Department of Natural Resources, for respondents.

**Stephen A. Ecenia** and **Ronald C. LaFace, Roberts, Baggett, LaFace & Richard,** for intervenor, Closter Farms, Inc.

### OPINION

DIANE D. TREMOR, Hearing Officer.

## FINAL ORDER

Pursuant to notice, an administrative hearing was held before Diane D. Tremor, Hearing Officer with the Division of Administrative Hearings, on May 21 and 22, 1985 in Tallahassee, Florida. This proceeding was instituted pursuant to Section 120.54(4), *Florida Statutes*, for a determination of whether "proposed rules" 16Q-15.01 and 16Q-15.07, as published in the *Florida Administrative Weekly*, Volume 11, Number 9, March 1, 1985, constitute invalid exercises of delegated legislative authority.

## INTRODUCTION

Petitioner Pahokee Farms, Inc. timely filed its petition, pursuant to Section 120.54(4), *Florida Statutes*, challenging the validity of what were published in the March 1, 1985, *Florida Administrative Weekly*, as proposed rules 16Q-15.01 and 16Q-15.07, pertaining to the leasing of state-owned lands in the Everglades Agricultural Area (EAA). In support of its position that the challenged proposed rules constitute an invalid exercise of delegated legislative authority, petitioner presented the testimony of Leonard Dubrow, an accountant in Pahokee, and John W. "Jack" Merriam, the Assistant Bureau Chief for the Bureau of State Lands Management, Department of Natural Resources. Petitioner's Exhibits 66, 81, 118, 118-A, 124, 124-A, 124-B, 125, 127, 127-A, 128, 129, 130, 130-A, 131, 133 and 134 were received into evidence.

Counsel for the Department of Natural Resources and the Board of Trustees of the Internal Improvement Trust Fund presented the testimony of James W. MacFarland, Director of the Division of State Lands, Department of Natural Resources, and Exhibits 4 through 7 and 8, which were received into evidence.

The intervenor Closter Farms, Inc. presented the testimony of Philip E. Sorensen, accepted as an expert witness in the areas of economics, economic impact statements and competitive bidding, and its Exhibit 1 was received into evidence.

Subsequent to the hearing, all parties submitted memoranda on the narrow legal issue of whether the statements published and challenged herein constitute "rules" subject to challenge pursuant to Section 120.54(4), *Florida Statutes*. The parties also submitted proposed findings of fact and proposed conclusions of law regarding the substantive merits of the challenged published "rules." The undersigned has carefully considered these post-hearing submittals. Many of the proposed findings of fact and conclusions of law relating to the substance of the challenged "rules" are not addressed in this Order because they

are not relevant or material to the issue found to be dispositive in this proceeding.

## FINDINGS OF FACT

Upon consideration of the oral and documentary evidence adduced at the hearing, as well as the factual stipulations of the parties, the following relevant facts are found:

(1) Petitioner Pahokee Farms, Inc. is a Florida corporation which, since 1960, has been a lessee of state-owned agricultural lands in the Everglades Agricultural Area (EAA) in Palm Beach County. Its present lease expires December 31, 1985.

(2) Leases of state-owned lands within the EAA are presently governed by existing Rule 16Q-15.07(3), *Florida Administrative Code*. This Rule provides that the Board of Trustees of the Internal Improvement Trust Fund (Board) may offer to lease lands in the EAA "by negotiation or competitive bidding." The actual practice and policy for extending leases in the EAA has, in fact, been one of negotiation rather than competitive bidding. Land has generally been re-leased to existing leaseholder paid its rent in a timely manner, properly cared for the land and was willing to pay an increased rental fee based on the current appraisal of the land.

(3) In June of 1982, Pahokee Farms, Inc. requested two five-year extensions of its agricultural lease in the EAA. The matter was deferred from the October 18, 1983 meeting of the Board of Trustees and rescheduled for the November 1, 1983 meeting. At the November 1, 1983 meeting of the Governor and Cabinet, sitting as the Board of Trustees, several members of the Board, as well as the Executive Director of the Department of Natural Resources, expressed an interest in reexamining the policy regarding agricultural leases in the EAA. For this reason, as well as the fact that several members of the Board were not present, the agenda item regarding the Pahokee Farms lease extension was deferred again to the November 17, 1983 meeting. At the November 17th meeting, the Board of Trustees directed the DNR staff, in consultation with the State Lands Management Committee, to formulate "policy recommendations" for the leasing of state-owned lands in the EAA for submission to the Board in February of 1984. The Board voted to establish its policy at that time and to then apply that policy to Pahokee Farm's request for extensions of its lease.

(4) As a result of the Board of Trustee's directions to develop policy recommendations, DNR, through the Division of State Lands, prepared a report to the Governor and Cabinet on policies for leasing

224

state-owned lands in the EAA. The report, dated March 20, 1984, set forth four options for leasing such lands, but ultimately recommended a competitive bid process through the request for proposals for leases. The report, after being deferred from the March 20, 1984, meeting, was scheduled for the April 19, 1984, meeting of the Board of Trustees. The agenda item recommends "acceptance of the report and approval of recommendations."

(5) At the April 19, 1984, meeting of the Governor and Cabinet, sitting as the Board of Trustees, there was extensive discussion as to what the State's policy should be with respect to state-owned lands in the EAA. After directing the staff to develop a specific plan of action, with the Board's approval, to sell or exchange state-owned lands leased for agricultural purpose in order to acquire other valuable lands, the Board then turned to the leasing issue. Governor Graham offered an amendment to the DNR report's recommended option of competitive bidding through the use of requests for proposals. The Governor's amendment to the DNR's recommendation was a two-step bidding process, calling for an initial qualification of bidders procedure and then the bid itself to be based upon both appraised value and a percentage of profits from the parcel leased. The qualified applicant offering the highest payment to the State was to be awarded the lease. Vacating lessees were to be compensated by the new lessee for ratoon or other crops based on an appraisal performed by an independent appraiser. The Governor's amendment also deleted the DNR's recommendation to provide a first right to renegotiate with existing lessees whose lease expires within four years.

(6) Prior to the Board's adoption of the Governor's amendment on April 19, 1984, a question was raised as to whether this "amendment" should be promulgated as a rule and subject to the Administrative Procedure Act. Governor Graham responded:

". . . Well, what we're doing, Mr. — we're accepting a report. That's what we're doing at this point. We're not in a rulemaking posture." (DNR's Exhibit 9, page 209, lines 8-11).

Attorney General Smith remarked that the staff would have to

"do their developing toward inventing a rule here. That will have to come back through the process." (DNR's Exhibit 9, page 205, lines 16-18).

Mr. Smith reiterates that

"We routinely develop the policy direction and the staff goes out and makes that into a rule and comes back to us through that process,

**225**

and I would contemplated that that would be done here." (DNR's Exhibit 9, page 206, lines 1-4).

Governor Graham again expressed the opinion that what the Board was doing was, under its agenda item, "accepting the report which has been amended." (DNR's Exhibit 9, page 207, lines 5 and 6). Mr. Turlington stated:

". . . when we're voting this, we're just voting, you know, to kind of indicate to people how we're heading, and that we can handle things in a flexible, legal manner in the days ahead in order to take care of legal entanglements that some may care to inject at some future point, and I just want to be on record to make that clear. . ." (DNR's Exhibit 9, page 208, lines 6-12).

(7) That DNR staff thereafter drafted and the DNR Executive Director directed publication of what appears in the March 1, 1985, edition of the *Florida Administrative Weekly* as "proposed rules" 16Q-15.01 and 16Q-15.07. The published material differs in some respects from the Governor's amendment approved by the Board. For example, where the approved amendment provides that the participation rent factor be based upon a "percentage of the profits," the DNR's published material requires that the participation rent factor be "2% of the gross income." The compensation to vacating lessees for ratoon or other residual crops under the Governor's amendment was to be based upon an appraisal by an independent appraiser. DNR's published material requires compensation based upon "the remaining portion of unamortized planting costs." The published material also provides for a discretionary exemption from the qualification procedure for parcels less than 100 acres or where the annual rental value is estimated to be less than $10,000. The Board's amendment contains no such exemption.

(8) The two DNR persons most involved with the preparation and drafting of the published "proposed rules" each felt that the Governor's amendment adopted by the Board of Trustees was a policy statement direction and that it was their duty to develop a rule based upon that direction. Each felt that they were charged with the responsibility of drafting a rule and bringing it back to the Governor and Cabinet for their concurrence, their approval and their adoption. Mr. MacFarland, Director of the Division of State Lands, referred to certain portions of the published material, at least where it is different than the Board's amendment, as a "staff recommendation." (Transcript, Vol. III, page 89, line 19; also see page 27, line 25). Mr. Merriam, the Assistant Chief of the Bureau of State Lands Manage-

ment, refers to the published material as a "draft rule." (Transcript, Vol. I, page 172, line 20).

(9) The material published in the *Florida Administrative Weekly* on March 1, 1985, has never been presented to the Governor and Cabinet sitting as the Board of Trustees. While the published notice did state that a hearing would be held by the Department of Natural Resources and the Board of Trustees on March 19, 1985, this meeting never occurred.

## CONCLUSIONS OF LAW

In any proceeding seeking an administrative determination of the invalidity of a proposed or existing rule pursuant to Sections 120.54(4) or 120.56, *Florida Statutes*, there are four basic or general areas of inquiry. First, are the parties participating in the rule-challenge proceeding substantially affected by the rule? Second, is the statement or document being challenged truly a "rule" within the meaning of the Administrative Procedure Act? Third, was there compliance with the rulemaking requirements of Section 120.54, *Florida Statutes*, or, stated differently, is the rule procedurally valid? And, fourth, is the rule substantively valid?

In this proceeding, the parties have stipulated and it is concluded that the petitioner Pahokee Farms, Inc. and the intervenor Closter Farms, Inc. have each sufficiently alleged and demonstrated their substantial interest in the published "proposed rule."

The next area of inquiry is whether the material published in the *Florida Administrative Weekly*, Volume 11, Number 9, March 1, 1985, constitutes a "rule". Ordinarily, this inquiry is considered only when a party challenging what is alleged to be an agency statement of general applicability that implements, interprets or prescribes law or policy or describes the organization, procedure or practice requirements of an agency when that statement is unpublished or unpromulgated as a rule. Ordinarily, when one is confronted with a "proposed rule" published in the *Florida Administrative Weekly* or an "existing rule" appearing in the *Florida Administrative Code*, it is assumed that the same is, indeed, a "rule" within the meaning of the Administrative Procedure Act. This assumption, however, is unwarranted and contradicted by the evidence in the record of this proceeding.

The substance of the "proposed rule" is clearly a statement of general applicability that implements, interprets and prescribes policy and describes practice requirements with regard to the leasing of state lands in the EAA. This is a portion of the definition of a "rule"

227

contained in Section 120.52(15), *Florida Statutes*. But, it is only a portion. The important words omitted are that the statement be an "agency" statement and that it describe the requirements of an "agency." Prior to adoption of a rule, an "agency" must given notice "of *its intended* action." Section 120.54(1), *Florida Statutes*. "Agency action" means a rule and "agency head" means the person or collegial body statutorily responsible for final "agency action." Section 120.52(2) and (3), *Florida Statutes*.

Here, the governmental unit statutorily responsible for the administration of all state-owned lands and the adoption of rules to carry out that purpose is the Governor and Cabinet, sitting as the seven-member Board of Trustees of the Internal Improvement Trust Fund. Section 253.03(7), *Florida Statutes*. The Division of State Lands, located within the Department of Natural Resources, performs the staff duties and functions related to the acquisition, administration and disposition of state lands. Section 253.002, *Florida Statutes*. The Division of State Lands has no independent authority to adopt rules relating to the administration of state lands.

Among the powers, duties and functions of an agency head are to promulgate rules subject to the requirements of the Administrative Procedure Act. Section 20.05(5), *Florida Statutes*. Agency heads do have the authority, unless explicitly prohibited, to execute their powers, duties and functions through designated assistants and deputies. Section 20.05(1)(b), *Florida Statutes*. In this case, there was published a notice of intent to adopt rules. The evidence is undisputed that these proposed rules, in the form published, have not been presented to the Board for its approval. Thus, the issue becomes one of whether the Board of Trustees could and did delegate its authority to propose the "rules" in question in this proceeding? State differently, are the "rules" the "intended action" of the Board of Trustees? If not, there is, at this time, nothing subject to challenge under Section 120.54(4), *Florida Statutes*.

The Board of Trustees has, by rule, delegated to the Executive Director of DNR, or his designee, authority to act in certain areas. Among the delegations is the authority "to initiate all rulemaking," and to perform necessary functions "as authorized by law or by rules and policies adopted by the Governor and Cabinet." Rule 16-1.05(1)(q) and (r), *Florida Administrative Code*. No delegation to "approve" or "adopt" rules has been made. One *might conclude* that the "initiation" of rulemaking includes the publication in the *Weekly* of notice of intent to adopt a proposed rule. However, whether or not the DNR had the authority to *publish* something in the *Weekly* is not the determinative

issue in this case. The determinative issue is whether the material published is indeed the *intended action* of the Board of Trustees, and thus is a "proposed rule" ripe for a determination of its validity.

The factual findings in this case demonstrate that neither the Governor and Cabinet sitting as the Board of Trustees, nor the "drafters" of the published material under challenge, intended this material to be the "agency" statement prior to its approval by the Board. At the April 19, 1984, meeting of the Board, the DNR staff was given a directive to develop a rule in accordance with the Governor's amendment to the recommendations previously submitted. It was clearly contemplated by members of the Board that the rule "invented" or "developed" would come back to the Board for approval. DNR staff conceived their duties and functions as those of developing a "rule" and bringing it back to the Board for their approval. They considered the published material to be a "draft" and a "recommendation" for approval by the Board. The published material cannot be considered any more of a "rule" than the original recommendations submitted to the Governor and Cabinet at the April 19, 1984, meeting of the Board of Trustees. This is particularly true in light of the variations between the "proposed rule" and the Governor's amendment approved on April 19, 1984.

Simply stated, the published material is not the "intended action" of the Board subject to a determination of validity or invalidity under Section 120.54(4), *Florida Statutes*. At most, it is a recommendation to the Board of Trustees as to what the "intended action" should be. The Board has not yet determined that this "proposed rule" is its intended action. To hold otherwise would convert a proposed rule-challenge proceeding under Section 120.54 into a proceeding which seeks some form of advisory opinion from a Hearing Officer of the Division of Administrative Hearings as to the validity of an agency policy *should* the agency wish to adopt one. It is not the function of the Division of Administrative Hearings to finally determine the validity of agency rules or policies prior to the time that the agency has determined what its policy will be. The Division of Administrative Hearings may only render recommended or final orders in matters in which the parties are either substantially affected or whose substantial interests are determined by "agency action." Here, the Board has not "acted" with respect to these "proposed rules."

In summary, it is concluded that the material published and challenged herein is not a "proposed rule" within the meaning and intent of the Administrative Procedure Act, and thus is not ripe for an administrative determination of its validity. Having reached this con-

229

clusion, it is unnecessary to determine the remaining issues regarding the substantive merits of the published materials.

## FINAL ORDER

Based upon the findings of fact and conclusions of law recited herein, it is ORDERED that the materials published in the *Florida Administrative Weekly*, Volume 11, Number 9, on March 1, 1985, pages 691 to 694, do not constitute "proposed rules" of the Board of Trustees of the Internal Improvement Trust Fund, and this proceeding brought pursuant to Section 120.54(4), *Florida Statutes*, is therefore DISMISSED.

Ordered and entered this 9th day of August, 1985, in Tallahassee, Florida.